[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
2/02/99
THOMAS K. KAHN
CLERK

No. 96-9250

D. C. Docket No. 95-CR-27-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM NEY RAMIREZ-PEREZ,
MACLAVIO AVELLANEDA-GAMA,
HOMERO AVELLANEDA-GAMA,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Georgia

(February 2, 1999)

Before TJOFLAT and HULL, Circuit Judges, and KRAVITCH, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Homero Avellaneda-Gama ("Homero"), Maclavio Avellaneda-Gama ("Maclavio"), and

William Ney Ramirez-Perez ("Ramirez") challenge their convictions and sentences for multiple

offenses relating to a methamphetamine distribution conspiracy. We dispose of their challenges

as follows.  We vacate Maclavio's convictions for conspiracy to distribute methamphetamine and possession with the intent to distribute methamphetamine, and remand the case for a new trial on those charges, because the district court violated the Bruton[1] rule when it allowed a prosecution witness to relate an out-of-court statement made by Homero that implicated Maclavio.  We affirm Maclavio's remaining conviction for possession of a firearm as well as the convictions of Homero and Ramirez.  Finally, we vacate the portion of Homero's sentences that mandates, as a condition of supervised release, that Homero be deported; the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), as amended by Act of Oct. 11, 1996, Pub. L. No. 104-302, 110 Stat. 3656, divested the district court of authority to impose such a condition.

I.

On November 9, 1995, an agent of the Georgia Bureau of Investigation ("GBI") met with a confidential informant, who placed a telephone call to Homero and told him he knew someone who wanted to purchase drugs.  The undercover agent then took the phone and told Homero that he wanted to buy one-half ounce of methamphetamine and one pound of marijuana.  Homero agreed to meet with the agent and deliver the drugs on November 15; he said that he would be accompanied by his brother-in-law, Ramirez.

On November 15, Homero and Ramirez appeared at the designated meeting place and consummated the transaction.  At that time, Homero provided the agent with one-half ounce of methamphetamine but was unable to deliver the marijuana.  After paying for the drugs, the agent

_____

[1] Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

2

indicated that he would like to purchase an additional three pounds of methamphetamine and thirty pounds of marijuana. Homero replied that it would be no problem.

On November 20, the agent contacted Homero and asked him when the drugs would be available. Homero said that he had obtained the three pounds of methamphetamine, but that the marijuana had not yet arrived. The agent agreed to purchase the methamphetamine provided Homero sold him an additional pound. Homero agreed to do so, and the two arranged to consummate the transaction at the Days Inn in Commerce, Georgia.

On November 22, the agent, accompanied by a squad of law enforcement officers, obtained a room at the Days Inn and set up surveillance equipment in adjoining rooms and in the hotel parking lot. At 10:10 a.m., the agent called Homero. A short time later, Homero, Maclavio, and Ramirez arrived at the hotel parking lot. Homero came in a Ford Mustang and parked it at one end of the parking lot, facing the hotel. Ramirez drove a Ford Escort and parked it at the other end of the parking lot, facing the street. Maclavio was sitting in the passenger seat of the Escort. Homero and Ramirez exited their vehicles and walked around the parking lot, peering into other cars. Ramirez then twice walked from the Escort to the rear of the hotel and back. According to a GBI agent, Ramirez appeared to be acting as a "lookout." Ramirez finally got back into the driver's side of the Escort and closed the door.

Finally, Homero walked over to the Escort and was handed a shoe box wrapped with duct tape through the driver's side window. Homero then proceeded into the hotel. Once inside the agent's room, Homero opened the shoe box, removed several packages, and gave them to the agent. The packages contained methamphetamine. At this point, the officers closed in and arrested Homero, Maclavio, and Ramirez. In addition to the drugs, the officers confiscated a

3

nine millimeter pistol they found in a box under Maclavio's seat in the Escort, as well as an employment authorization card issued by the Immigration and Naturalization Service ("INS") that was in Homero's possession.

A six count indictment, returned by a Northern District of Georgia grand jury, charged Homero, Maclavio, and Ramirez as follows. Count one charged all three defendants with conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846. Count three alleged that on November 15 Homero possessed methamphetamine with the intent to distribute, and count four alleged that on November 22 all three defendants possessed methamphetamine with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Count five charged Homero and Maclavio with possession of a firearm on November 22 while being an illegal alien, in violation of 18 U.S.C. § 922(g)(5). Finally, counts two and six charged Homero with willfully making a false attestation for the purpose of receiving an employment authorization card from the INS and with possession of an employment authorization card that he had procured by means of a false statement, in violation of 18 U.S.C. § 1546(a)-(b).[2] Each defendant pled not guilty. At the conclusion of a joint trial the jury found the defendants guilty on all counts.[3]

_____

[2] Homero received the INS employment authorization card after applying for political asylum. Although Homero was a Mexican citizen, he stated on his application that he was a citizen of Guatemala and had fled his country to escape guerilla fighters who had threatened his life.

[3] The district court sentenced the defendants to terms of imprisonment, followed by five years supervised release. A condition of Homero's supervised release was that he be deported upon release from prison.

II.

Maclavio seeks a new trial on the ground that the district court erred in permitting a GBI agent to relate a post-arrest statement made by Homero that inculpated Maclavio. The statement was that the nine millimeter pistol the officers found in the box located under Maclavio's seat in the Escort had been carried to the Days Inn parking lot by Maclavio at Homero's instruction. The agent testified as follows:

Q. Did [Homero] tell you whose pistol it was?
A. Yes, he did.
Q. Whose did he say it was?
A. He said the pistol belonged to him. He had bought it at the Georgia Mountains Center.
Q. Did he tell you whether or not he had asked to have the pistol brought to that meeting?
A. Yes, he did.
Q. And what did he say?
A. He stated he wanted the pistol at the location for protection in case I tried to rip him off.

Maclavio contends that Bruton barred the admission of this testimony. In that case, the Supreme Court held that the admission of an out-of-court statement of a non-testifying co-defendant in a joint trial violated the Sixth Amendment's Confrontation Clause. Although Homero's statement did not explicitly refer to Maclavio, Maclavio argues that the statement implicated him because other evidence in the case made it clear that Homero was referring to him when he told the agent that he asked that the pistol be brought to the Days Inn "for protection."

Although the Government concedes that allowing Homero's statement into evidence violated Bruton, it claims that the error was harmless because the jury had already been informed

5

of Maclavio's post-arrest statement, in which Maclavio admitted bringing the pistol to the hotel.[4] Consequently, the Government argues, Homero's statement did not further incriminate Maclavio; it merely indicated that Maclavio brought the pistol to the crime scene at Homero's initiative rather than his own.[5]

We conclude, however, that the admission of Homero's statement was not harmless error. To demonstrate why, it is first necessary to consider the inferences the jury may have drawn from the evidence as to why Maclavio brought the gun to the crime scene had Homero's statement not been admitted into evidence. First, Maclavio may have brought the gun for his own protection (this reason is particularly plausible in light of the fact that Maclavio was an illegal alien and may have been carrying a pistol to protect himself from the authorities). Another possibility is that Maclavio realized from Homero's and Ramirez' actions that they were up to some mischief, so he brought the weapon for his own safety. Neither of these two reasons for bringing the pistol to the scene would have implicated Maclavio in the conspiracy. Finally, Maclavio could have brought the pistol to facilitate the drug transaction. Without Homero's statement that he told Maclavio to bring the gun, the jury would have had no reason to choose the third inference over the first two – in other words, the evidence would have been in

---

[4] Maclavio made the admission while being interrogated by an INS agent after having been advised of his Miranda rights. At the conclusion of the interrogation, the agent summarized what Maclavio had said in a written statement which Maclavio signed. During the Government's case-in-chief, the agent testified as to what Maclavio said during the interrogation. The Government, however, did not offer the written statement into evidence.

[5] During his post-arrest interrogation by the INS agent, Maclavio said that either Homero or Ramirez instructed him to carry the pistol to the Days Inn parking lot. The INS agent did not reveal this fact, however, in his testimony during the Government's case-in-chief. See part III, infra. Consequently, the jury learned only from Homero's statement that Maclavio brought the gun at Homero's instruction.

6

equipoise.  Homero's statement that he told Maclavio to bring the pistol eliminated the first two inferences – it told the jury that Maclavio brought the gun for Homero's reason rather than his own (potentially innocent) reasons.

With Homero's statement in the record, the jury could infer that Maclavio knew Homero's reason for wanting the pistol brought to the hotel.  Homero wanted the pistol for protection in case his buyer attempted to "rip him off."  This fact raised the inference that the gun carrier would be expected to watch for danger so that he could protect the group if danger arose – in essence, the gun carrier would need to act as a lookout.  Having drawn these inferences, the jury could infer that the gun carrier would know the reason for going to the hotel.  In order to protect the group, the gun carrier would need to know what danger loomed ahead.  Given that Homero was entrusting his life to the gun carrier, the jury would deem it unlikely that Homero would risk his own life by leaving his protector in the dark about what was about to transpire.  In sum, that Homero instructed Maclavio to bring the gun strongly suggested that Maclavio knew the reason for going to the hotel (and also that Maclavio actively participated in the conspiracy by acting as a lookout).

This final inference was particularly strong in light of the fact that Homero entrusted Maclavio with the only weapon the group brought with them to the drug deal, and Maclavio was the only one who had easy access to it.  Homero never had access to the pistol – from the time the group left their house until they were arrested, Homero never came near the seat under which the gun was hidden.  Furthermore, Ramirez had only limited access to the gun.  After the group arrived at the hotel, Ramirez and Homero got out of their cars and walked around the parking lot peeking into cars (presumably looking for danger).  During this time, Maclavio was alone in the

7

Ford Escort with the pistol. If any trouble arose, Maclavio was the only one who had access to the weapon. After Ramirez returned to the Escort, he could have used the weapon, but he would have had to reach across the front seat, through Maclavio's legs, and under the seat to retrieve it. In fact, there is no evidence indicating that Ramirez even knew that Maclavio had put the pistol under his seat. Consequently, if the gun was needed, only Maclavio could quickly have drawn the weapon from its hiding place. This suggests that Homero expected Maclavio – and only Maclavio – to protect the group with the pistol if danger arose.

Finally, given that Homero asked Maclavio to bring the gun (rather than Maclavio having brought the pistol for his own reasons), it seems counter-intuitive that Maclavio would have placed the gun in the car without knowing why it was needed. When someone is asked to place a gun in a car, and then get in that car themselves, we would expect that person to ask why the gun is required. The need for a gun would tip off most people that they were likely to encounter danger, and most people would ask questions about what they were about to do. The fact that Homero asked Maclavio to bring the pistol raised a reasonable inference that Maclavio either asked Homero why the gun was needed, or did not need to ask because he already was part of the conspiracy and therefore knew the reason for the gun. It certainly would not have been unreasonable for the jury to infer from Homero's statement that Maclavio knew what Homero was about to do.

In short, the fact that Homero told Maclavio to bring the pistol eliminated all of the other possible reasons for the presence of the gun. Additionally, that fact raised the strong inference that Maclavio knew why the gun was needed. This inference was particularly harmful to Maclavio's defense because without it there was only sparse evidence connecting Maclavio to

8

the drug conspiracy. Prior to his arrival at the Days Inn parking lot, none of the Government's witnesses had ever seen or heard of Maclavio, and none of the law enforcement officers surveilling the parking lot saw Maclavio do anything besides remain slumped in the passenger seat of the Escort – unlike Homero and Ramirez, Maclavio never handled the drugs or left the car.

Homero's statement aside, the only evidence against Maclavio was his presence in the Escort and the fact that he placed the pistol under his seat. As discussed above, without Homero's statement, the evidence was in equipoise as to Maclavio's reason for bringing the pistol to the Days Inn. Thus, the mere fact that he placed the pistol under his seat did little to implicate Maclavio in the conspiracy. Furthermore, Maclavio's mere presence at the crime scene, without other evidence, would have been insufficient to prove his guilt. See United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990). Thus, the evidence against Maclavio probably would have been insufficient if not for Homero's statement.

Because a jury reasonably could have concluded from Homero's statement that Maclavio was guilty of both the conspiracy to distribute methamphetamine and the possession with the intent to distribute methamphetamine charges, the admission of Homero's statement was not harmless error. We therefore vacate Maclavio's convictions on those two counts, and remand his case to the district court for a new trial.[6]

_____

[6] The Bruton error was harmless as to Maclavio's conviction for possession of a firearm while being an illegal alien. Because Macalvio admitted that he brought the pistol to the hotel, the only effect of Homero's statement was to raise an inference that Maclavio knew why the pistol was needed. Although that inference implicated Maclavio in the conspiracy and substantive possession charges, it did not further implicate him in the possession of a firearm charge.

9

III.

Maclavio next challenges the district court's decision to allow into evidence testimony regarding inculpatory parts – but not exculpatory parts – of the statement that he made to the INS agent following his arrest. The gist of the exculpatory parts of Maclavio's statement was that he knowingly brought the pistol, but that he did not know either that they were going to the hotel or that they were engaged in a drug transaction. Maclavio said that he fell asleep in the Escort when they arrived at the hotel, and that he did not awaken until the agents arrested him.

At trial, the Government attempted to admit Maclavio's signed statement into evidence. As noted supra, that statement was prepared and signed following Maclavio's interrogation by the INS agent. Because Maclavio's signed statement inculpated Ramirez, Ramirez' counsel objected on Bruton grounds, and moved the court to redact the portions of the statement that mentioned Ramirez. Maclavio's attorney, in turn, objected to the redaction of any portion of the statement. He argued that the statement would be misleading if only a portion was admitted into evidence and that Federal Rule of Evidence 106 prohibited the admission of the statement in an incomplete form. Furthermore, Maclavio's attorney claimed, Rule 106 would apply even if the prosecutor chose to question the INS agent about what Maclavio said during interrogation, rather than introducing his written statement into evidence. If the prosecutor chose this option, Maclavio's attorney contended that the rule entitled him to cross-examine the agent about anything in Maclavio's statement – regardless of whether it was inculpatory or exculpatory.

The court agreed with Maclavio's attorney that if the prosecutor offered any part of the written statement into evidence, then the entire statement would have to be admitted. The court disagreed, however, that if the prosecutor examined the agent about what Maclavio told him

10

during the interrogation – which preceded the signing of the statement – then Maclavio's attorney would be entitled on cross-examination to inquire as to exculpatory portions of it.[7] Implicit in the court's ruling was that Maclavio's attorney could cross-examine the agent about anything brought out on direct examination.

The prosecutor, deciding not to offer the written statement, then questioned the INS agent about what Maclavio said during interrogation. The agent testified as follows:

> Q. Mr. Arrugueta, did Mr. Maclavio Avellaneda-Gama tell you whether he brought the firearm from home that morning?
> A. Yes sir, he did.
> Q. Did he tell you whether or not it was in the box?
> A. Yes sir, he did.
> Q. And what did he say? Was it in the box?
> A. He stated that, yes, it was in the box.
> Q. Did he tell you whether or not he was aware of the presence of another box in the automobile in which he was driving – in which he was riding?
> A. He mentioned another box, but he did not state that it was in the automobile, as I recall.
> Q. Did he tell you whether or not he knew that there was a pistol in the box that he carried from home?
> A. Yes, sir, he did. He stated he did have knowledge there was a pistol in the box.
> . . . .
> Q. Did he tell you where he placed the pistol and the box?
> A. He stated that, once he was in the vehicle in which he rode, he placed the pistol in the box under his seat.

Maclavio's attorney, citing Rule 106, moved to strike this testimony. The court denied the motion.

Maclavio now appeals this ruling. According to Maclavio, Rule 106 applied to the agent's testimony about what Maclavio said during interrogation because Maclavio's statement

---

[7] The court concluded that Maclavio's attorney could not cross-examine the agent about Maclavio's exculpatory statements because these statements were hearsay. Unlike Maclavio's inculpatory statements, which were admissible as statements against interest, the exculpatory statements did not fit into any hearsay exception.

was reduced to writing. Consequently, anything that Maclavio said that was "necessary to qualify, explain, or place into context the portion already introduced" was admissible. United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988). Maclavio claims that the exculpatory portions of the statement place the INS agent's testimony into context in two respects.

First, Maclavio asserts, although the agent's testimony created the inference that Maclavio knew about the drug deal, his complete statement makes it clear that he said he neither knew where they were going nor why. Second, although the agent stated that Maclavio admitted he knew that a second box existed, Maclavio denies having made such an admission. In light of the fact that the methamphetamine was carried in a box, and that this box was driven to the hotel in the car in which Maclavio was a passenger, Maclavio stresses that whether he knew about this box was of vital importance. Without the complete statement, Maclavio contends, the jury was misled into believing that Maclavio admitted he knew a second box existed. In short, Maclavio claims that under Rule 106 the court should either have struck the agent's testimony, or allowed Maclavio's attorney to bring out on cross-examination anything that might be considered exculpatory.

We disagree that Federal Rule of Evidence 106 was implicated by the INS agent's testimony regarding Maclavio's statement. Rule 106 applies only (with one narrow exception discussed below) when a written document is admitted into evidence. Because the agent testified as to what Maclavio told him during interrogation, and published nothing in the written statement, Rule 106 does not apply to the agent's testimony.

Rule 106 states: "When a writing or recorded statement or part thereof is introduced by a

12

party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." (emphasis added). Because Maclavio's written statement was not introduced, the plain language of Rule 106 indicates that it does not apply.

Despite this plain language, we have held that Rule 106 does apply in limited circumstances even when no document is admitted into evidence: when a document is used in such a way that it is "tantamount" to introduction of the document itself, we have stated that the principle behind Rule 106 should apply because the same concerns about fairness and completeness are present. See Pendas-Martinez, 845 F.2d at 943 (citing Rainey v. Beech Aircraft Corp., 784 F.2d 1523, 1529 n.11 (11ᵗʰ Cir. 1986), aff'd en banc, 827 F.2d 1498, 1499 (1987), rev'd in part on other grounds, 488 U.S. 153, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)). Rainey involved a negligence and product liability claim that arose from a Navy aircraft accident. The plaintiff in that case, a Navy flight instructor, had written a letter to the officer who wrote the Navy report on the accident challenging the officer's opinion about the cause of the crash. We concluded that the principle behind Rule 106 applied because on direct examination of the plaintiff, who was called as an adverse witness in the defense's case-in-chief, defense counsel (in his questions and through the plaintiff's answers) published two paragraphs of the letter.[8] We stated that the policy underpinning Rule 106 was implicated – and required the court to permit plaintiff's counsel on cross-examination to publish other, related paragraphs of the letter – because the two paragraphs defense counsel had introduced were misleading when

---

[8] The letter was not introduced into evidence. Apparently, plaintiff's counsel decided not to object to defense counsel's questions about the contents of the letter – which resulted in the publication of two paragraphs of the letter – on best evidence grounds.

read by themselves. Thus, although the letter itself was not admitted into evidence, the result of defense counsel's questions was that parts of the letter effectively were introduced into evidence. See Rainey, 784 F.2d at 1529-30.

The same principle does not apply in this case, however. Here, the agent testified regarding portions of the statement Maclavio made while being interrogated. Although Maclavio's statement was reduced to writing and signed, the prosecutor's questions did not refer to this writing. (In fact almost all of the prosecutor's questions regarding the pistol began with "Did he tell you . . . ." These questions therefore referred to the agent's conversation with Maclavio, not to the signed document). Because the prosecutor questioned the agent only about what Maclavio said rather than about what was written in the document, Rule 106 did not apply.[9]

_____

[9] Although Rule 106 did not authorize Maclavio's attorney, in cross-examining the agent, to go beyond the scope of direct examination and elicit the exculpatory portions of his statement to the agent, Maclavio had several options available to correct any inaccuracies in the agent's testimony. First, Maclavio was entitled to cross-examine the agent about anything he said on direct. Maclavio could have questioned the agent, for example, about whether Maclavio actually said he knew that a second box existed. Although Maclavio's brief argues that the agent's testimony on this point was both inaccurate and highly prejudicial, nothing would have prevented Maclavio from questioning the agent in order to reveal what Maclavio actually said.

Second, if the agent's answers on cross-examination contradicted Maclavio's written statement, Maclavio could have impeached the agent's testimony by offering into evidence those portions of the statement that the agent contradicted. The agent had read Maclavio's written statement, and thus had refreshed his recollection, before testifying about what Maclavio said during interrogation. Federal Rule of Evidence 612 would have entitled Maclavio to offer into evidence for impeachment purposes any portion of the statement that was inconsistent with the agent's testimony.

Third, Maclavio could have called the agent as a witness during the presentation of his own case, and questioned the agent about portions of the statement Maclavio had made (during interrogation) that were not covered in the agent's testimony during the Government's case-in-chief. Such questions, of course, would have been subject to a hearsay objection. To avoid such objection Maclavio would have needed to convince the court that those portions of the statement were against his interest when made, and therefore were admissible under Rule 804(b)(3).

Although Maclavio's brief argues that it was "fundamentally unfair" to allow the agent to testify about the inculpatory parts – but not the exculpatory parts – of Maclavio's statement,

14

The district court, therefore, did not abuse its discretion in allowing the INS agent to testify regarding inculpatory portions, but not exculpatory portions, of Maclavio's statement.

IV.

In its sentencing order, the district court relied on 18 U.S.C. § 3583(d) to order Homero deported after his release from imprisonment. On appeal, Homero claims the district court lacked the authority to deport him. We agree. In United States v. Romeo, 122 F.3d 941, 943-44 (1997), we held that 8 U.S.C. § 1229a(a), enacted as part of IIRIRA, divested the district courts of jurisdiction to order deportation pursuant to section 3583(d).[10] We therefore vacate the portion of the district court's judgment that orders that Homero be deported upon his release from imprisonment.[11]

_____

Maclavio eschewed all of the options that could have corrected the alleged inaccuracies in the agent's testimony.

[10] Section 1229a(a) eliminates the district court's jurisdiction to order Homero deported even though the district court imposed its sentence before IIRIRA was enacted. Section 1229a(a) is an "[i]ntervening statute[] conferring or ousting jurisdiction" and therefore applies to all cases (such as Homero's) that were pending when the statute was enacted. Romeo, 122 F.3d at 944 (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 274, 114 S. Ct. 1483, 1501, 128 L. Ed. 2d 229 (1994)).

[11] Appellants raise several other challenges to their convictions and sentences: Ramirez and Maclavio challenge the sufficiency of the evidence on each count charged against them, and Homero challenges the sufficiency of the evidence on count five, claiming that the Government failed to satisfy either the jurisdictional element or the knowledge element of the offense. We reject these claims of error as meritless. Furthermore, Homero claims that he is entitled to a two point reduction to his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Homero also claims that the Government failed to satisfy its burden of proof on count five because it did not ask the court to certify as an expert its witness who testified that the pistol that formed the basis for count five traveled in interstate commerce. We reject these two claims because Homero failed to make timely objections during the trial.

V.

For the foregoing reasons, we VACATE Maclavio's convictions for conspiracy to distribute methamphetamine and possession with the intent to distribute methamphetamine, and remand his case to the district court for a new trial on these two counts. Furthermore, we VACATE the portion of the Homero's sentence ordering him to be deported upon his release from confinement. In all other respects, the judgment of the district court is AFFIRMED.