# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01550-COA

STACIE MURRAY                                                          APPELLANT

v.

JAMES GRAY D/B/A GRAY TRUCKING AND                          APPELLEES
KEVIN PARKER

DATE OF JUDGMENT:                06/28/2018
TRIAL JUDGE:                     HON. MARK SHELDON DUNCAN
COURT FROM WHICH APPEALED:       SCOTT COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          S. MALCOLM O. HARRISON
ATTORNEYS FOR APPELLEES:         MICHAEL EARL PHILLIPS
                                 CLAIRE K. ROBINETT
NATURE OF THE CASE:              CIVIL - PROPERTY DAMAGE
DISPOSITION:                     REVERSED AND REMANDED - 06/30/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### J. WILSON, P.J., FOR THE COURT:

¶1.     Stacie Murray was driving north on Highway 35 in Scott County when her car collided with a log truck traveling south. Murray sued the truck's driver, Kevin Parker, and his employer, James Gray d/b/a Gray Trucking, for damage to her car and personal injuries. A jury trial ended in a 9-3 verdict for the defendants. On appeal, Murray argues that the trial court erred (1) by overruling her hearsay objection to a highway patrol trooper's testimony about Parker's statement at the crash scene; (2) by admitting into evidence the Uniform Crash Report (UCR) prepared by the trooper, including a narrative and diagram reflecting the trooper's opinions about the vehicles' paths and the cause of the crash, and by allowing

defense counsel to cross-examine Murray's expert about the UCR's narrative; (3) by allowing the trooper, who was not qualified as an expert, to opine as to the cause of the crash; and (4) by allowing defense counsel to cross-examine Murray's expert about a judicial opinion and evidence from prior cases in which the expert testified or his testimony was excluded. We conclude that a new trial is required because Murray's hearsay objection should have been sustained, the UCR should not have been admitted into evidence or read during cross-examination of Murray's expert, and Murray's expert should not have been cross-examined about a court's opinion and evidence from other cases. Therefore, we reverse and remand the case for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

¶2. On April 1, 2014, between 9 and 10 p.m., Stacie Murray was driving home from work on a two-lane stretch of Highway 35 in Scott County. Murray was in the northbound lane. Kevin Parker was driving a fully loaded log truck in the southbound lane on the same stretch of Highway 35. Parker was in the course and scope of his employment for James Gray d/b/a Gray Trucking. The two vehicles collided. Murray's vehicle struck the driver's side of Parker's truck before passing behind the truck, leaving the road, and finally coming to rest on the west side of the highway. Murray sued Gray and Parker in the Scott County Circuit Court, alleging that she suffered personal injuries and property damage as a result of Parker's negligence. The case eventually proceeded to a two-day jury trial in June 2018.

¶3. At trial, Murray testified that she was "alert" and driving with "no problems" when suddenly she saw "lights." Murray stated, "I was driving north in my lane, and I just saw

2

lights . . . ." Murray was "[p]ositive" she was in her own lane when she saw the lights. The next thing that she could remember was being "disoriented" in her car on the side of the road. A man told her not to move because her car had been hit by a truck. Emergency medical technicians arrived and checked on Murray, but she did not go to the hospital that night. When she awoke the next morning, her ankle was bruised, swollen, and painful, so she went to the hospital.

¶4. On cross-examination, Murray reiterated that she was in her lane at the time of the crash. However, she later stated, "I was driving. I saw lights. When the impact happened, I don't know anything about that. But I'm constantly driving in my lane." In addition, Murray agreed with defense counsel that she did not have a specific "memory of where this collision took place."

¶5. On redirect examination, Murray again testified that she had no doubt that she was in her lane when the crash occurred and that she never deviated into the southbound lane. However, on re-cross-examination, Murray again equivocated as to whether she was certain that she was in her lane at the moment of the crash.

¶6. Parker testified that he was driving his truck in the southbound lane of Highway 35 when Murray's car suddenly entered his lane and drove "head-on" toward his truck. The shoulder of the road was narrow, but according to Parker, he tried to avoid Murray's car by swerving to the right. Parker testified that his passenger side tires went into the grass on the west side of the road. However, Murray's car still struck the side of Parker's truck near his door. Murray's car continued to contact the driver's side of the truck, causing damage along

3

the length of the truck before passing behind Parker's truck and coming to rest off the road on the west side of Highway 35. After the collision, Parker brought his truck to a stop along the side of the highway. Parker testified that he never entered Murray's lane and that the crash occurred entirely in his lane.

¶7. James Hannah testified for Murray as an expert in accident reconstruction. Hannah testified that he visited the scene about two months after the crash and found a "gouge mark" in the road in what he believed to be the approximate location of the collision. Hannah admitted that the highway patrolman who investigated the wreck, Trooper Greg Lucas, did not find or photograph any gouge marks. Hannah also admitted that he did not know whether the gouge mark was actually caused by the subject crash or predated the crash. In addition, Hannah did not photograph the gouge mark during his initial visit to the crash scene. When Hannah next visited the scene—about two years later—the highway had been overlaid, and the gouge mark was no longer visible. Thus, other than Hannah's testimony, there was no evidence of the gouge mark. The defendants filed a pretrial motion to exclude Hannah's testimony regarding the alleged gouge mark. They argued that Hannah's belief that the gouge marked established the point of impact was speculative and unreliable.[1] However, the trial court denied the motion and allowed Hannah to testify about the gouge mark.

¶8. Curiously, Hannah testified that the location of the alleged gouge mark indicated that the collision occurred slightly in the *southbound* lane—i.e., Parker's lane. Thus, Hannah

---

[1] The defendants relied in part on *Burnham v. Austin*, No. 3:14-cv-435-WHB (S.D. Miss. Sept. 11, 2015), an unpublished opinion in which a federal district court excluded similar testimony by Hannah that a gouge mark established the point of collision in a crash.

4

believed that part of Murray's car crossed into Parker's lane prior to the collision. In addition, Hannah accepted as true Parker's testimony that he swerved four to six feet in an effort to avoid Murray's car. However, Hannah disbelieved Parker's testimony that he swerved partially off the road because Hannah did not believe that there was any evidence at the scene or in Trooper Lucas's photographs that the log truck ever left the road. Thus, Hannah theorized that Parker's four-to-six-foot swerve must have started in Murray's lane—i.e., Parker must have invaded Murray's lane before swerving back to his right at the last moment. Accordingly, Hannah believed that Parker was at least partially at fault.

¶9. Over Murray's objections, defense counsel cross-examined Hannah regarding the Uniform Crash Report (UCR) that Trooper Lucas prepared regarding the accident. Defense counsel read directly from the UCR's narrative section, which reflected Trooper Lucas's opinions regarding the vehicles' paths and the cause of the wreck. Also over Murray's objections, defense counsel cross-examined Hannah about the federal district court's opinion in *Burnham*, *supra*, and evidence in two other cases in which Hannah testified. These issues are discussed in more detail below.

¶10. After Murray rested, the defendants called Trooper Lucas to testify. Defense counsel asked Lucas what Parker told him about the crash when they talked at the scene, and Murray asserted a hearsay objection. Defense counsel responded, "Judge, this would be potentially an admission against interest, but this would be information obtained during the course of his investigation." The court overruled Murray's objection, and Lucas testified, "I asked [Parker] what happened. He stated to me that the car come in on him and he swerved right

5

to avoid the car." Lucas testified that when he asked Murray what happened, "she replied she did not know."[2]

¶11. Lucas subsequently testified without objection that he concluded that Murray's car entered the southbound lane prior to the crash. Lucas testified that he based his conclusion on the location of debris; tires marks to the west of the highway, which indicated that Parker left the road in an effort to avoid Murray's car; the fact that Murray's car came to a final stop on the west side of the highway; and the statements of the drivers involved. Lucas's photographs of the crash scene and debris were admitted into evidence.

¶12. Finally, over Murray's objection, the UCR that Lucas prepared was admitted into evidence. The final page of the report includes a diagram and narrative that reflect Lucas's conclusions that Murray's car crossed the center line and caused the collision and that Parker's truck never crossed the center line.

¶13. Lucas was the defendants' only witness. Following jury instructions and closing arguments, the jury returned a 9-3 verdict for the defendants.[3] Murray filed a motion for a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

---

[2] Murray testified at trial that she was still disoriented when she talked to Lucas at the crash scene and that she could not remember what she told him.

[3] *See* Miss. Const. art. 3, § 31 ("[T]he Legislature may, by enactment, provide that in all civil suits tried in the circuit . . . court, nine or more jurors may agree on the verdict and return it as the verdict of the jury."); Miss. Code Ann. § 13-5-93 (Rev. 2019) ("In the trial of all civil suits in the circuit . . . courts of this state, nine or more jurors may agree on the verdict and return it into court as the verdict of the jury."); M.R.C.P. 48(a) ("Jurors in circuit . . . court actions shall consist of twelve persons, plus alternates . . . . A verdict or finding of nine or more of the jurors shall be taken as the verdict or finding of the jury.").

¶14. Murray argues that the trial judge erred (1) by allowing Trooper Lucas's hearsay testimony about Parker's statement at the crash scene; (2) by allowing defense counsel to read from the UCR's narrative section during his cross-examination of Hannah and by then admitting the entire UCR into evidence; (3) by allowing Trooper Lucas to opine as to the cause of the crash; and (4) by allowing defense counsel to cross-examine Hannah about an opinion and evidence in other cases in which Hannah testified or in which his testimony was excluded. We address these issues in turn below.

## I. The trial court abused its discretion by admitting Trooper Lucas's hearsay testimony.

¶15. As noted above, defense counsel asked Trooper Lucas what Parker told him at the crash scene. In response to a hearsay objection, defense counsel asserted that Parker's out-of-court statement "would potentially be an admission against interest" or would be "information obtained during the course of [Lucas's] investigation." The trial court overruled the hearsay objection, and Lucas testified that Parker told him that Murray's "car [came] in on him and he swerved right to avoid the car."

¶16. Parker's statement plainly was not an "admission against interest." Parker told Lucas that Murray caused the wreck. The statement was a self-serving one *in* Parker's interest.[4]

¶17. On appeal, the defendants argue that Lucas's testimony was admissible under Mississippi Rule of Evidence 803(6), an exception to the hearsay rule for "Records of a

---

[4] We note that Lucas's answer to the question was not a surprise. Lucas previously gave the same answer when he was asked the same question in his deposition. Lucas also talked to defense counsel in person or by telephone on other occasions and provided the defendants with an affidavit contradicting Hannah's claim about a gouge mark.

Regularly Conducted Activity." However, Lucas's trial testimony was not a "record." Lucas simply repeated on the witness stand what Parker had said on the side of the road. Parker's statement was not memorialized in any record. Moreover, even if Parker's statement had been memorialized, it still would not have been admissible under Rule 803(6). That exception to the hearsay rule does not necessarily permit the introduction of "all the contents" of a record of a regularly conducted activity. *Copeland v. City of Jackson*, 548 So. 2d 970, 975 (Miss. 1989). Mere "recitations of statements of others" (i.e., hearsay within hearsay) are not admissible simply just because they are written down or typed in such a record. *Id.* at 975-76. Our Supreme Court has explained:

> [T]he source of the material [contained in the record] must be an informant with knowledge who is acting within the course of the regularly conducted activity. This is exemplified by the leading case of *Johnson v. Lutz*, 253 N.Y. 124, 170 N.E. 517 (1930), which is still the applicable law today under [Rule 803(6)]. That case held that a police report which contained information obtained from a bystander was inadmissible; the officer qualified as one acting in the regular course of a business, but the informant did not.

*Minnick v. State*, 551 So. 2d 77, 88-89 (Miss. 1988) (quoting M.R.E. 803(6) cmt.), *rev'd on other grounds*, 498 U.S. 146 (1990), *and overruled on other grounds by Willie v. State*, 585 So. 2d 660, 681 (Miss. 1991).

¶18. Here, Parker was not acting in the course of any regularly conducted activity when he gave Lucas his version of the wreck. Therefore, his statement to Lucas would not have been admissible under Rule 803(6) even if it had been recorded, which it was not. A motorist's out-of-court statement to a law enforcement officer giving his or her own version of a wreck

8

is hearsay and may not be admitted in support of his or her own case.[5] *Swaggart v. Haney*, 363 So. 2d 251, 254-56 (Miss. 1978); *Gen. Motors Corp. v. Jackson*, 636 So. 2d 310, 342 (Miss. 1992). The trial court erred by overruling Murray's objection and permitting Lucas to give inadmissible hearsay testimony.

**II.** **The trial court abused its discretion by admitting the Uniform Crash Report into evidence and by allowing defense counsel to use the report's narrative to cross-examine Murray's expert.**

¶19. On appeal, Murray argues that the trial court erred by admitting into evidence the entire UCR, including its narrative and a diagram reflecting Trooper Lucas's opinions regarding the vehicles' paths and the cause of the crash, and by allowing defense counsel to cross-examine Murray's expert regarding the narrative section of the UCR. The trial court ruled that the UCR was admissible and that such cross-examination was permissible based on the Mississippi Supreme Court's decision in *Rebelwood Apartments LP v. English*, 48 So. 3d 483, 491-94 (¶¶35-47) (Miss. 2010), which applied the exception to the hearsay rule for "public records" found in Mississippi Rule of Evidence 803(8). We begin with a discussion of the *Rebelwood* case and then separately address the admissibility of the UCR and its use on cross-examination.

#### A. *Rebelwood*

¶20. *Rebelwood* was a premises-liability/wrongful-death suit against an apartment complex (Rebelwood). *Id.* at 485 (¶1). The decedent, Crystal Coleman, lived at Rebelwood, and her

---

[5] Of course, a statement by an opposing party that "is offered *against* [that] party" is not hearsay. M.R.E. 801(d)(2) (emphasis added). Thus, defense counsel properly asked Lucas what Murray told him. However, the defendants could not ask Lucas to repeat Parker's own self-serving version of events.

body was found in the passenger seat of her car in Rebelwood's parking lot. *Id.* at (¶2). She had died from a gunshot wound. *Id.* Coleman's father, Dwight English, sued Rebelwood, alleging that it failed to provide adequate security. *Id.* at (¶1). However, Cleveland Ellis, an acquaintance of Coleman, had confessed to police and to his family that he killed Coleman at another apartment complex (Woodbine Terrace) before driving Coleman's body to Rebelwood. *Id.* at (¶2). The Jackson Police Department (JPD) also obtained physical evidence and other witness statements that corroborated Ellis's confessions. *Id.* Prior to trial in the civil case against Rebelwood, English filed a motion to exclude all JPD reports, arguing that the reports contained inadmissible and prejudicial hearsay. *Id.* at (¶3). The trial court agreed and granted the motion. *Id.* at (¶5).

¶21.   At trial, English presented testimony from fact witnesses that "varied significantly from [their prior] statements to JPD officers during the investigation." *Id.* at (¶6). In addition, two of English's expert witnesses "testified that it was a fact that the shooting occurred at Rebelwood." *Id.* at 489 (¶27). Another of English's expert witnesses, Tyrone Lewis, then Deputy Chief of JPD, went so far as to testify that there was "no documentation, no written statements or anybody to come forward to say that it did not happen at Rebelwood." *Id.* (brackets omitted). Nonetheless, based on the trial court's in limine ruling, "JPD investigating officers . . . were severely limited in their testimony," and Rebelwood was not allowed to cross-examine English's experts regarding the findings of JPD's investigation and reports. *Id.* at 490-92, 494 (¶¶30, 35, 37-38, 47). The jury returned a $3,000,000 verdict against Rebelwood. *Id.* at 486 (¶7).

10

¶22. On appeal, the Supreme Court addressed two issues related to the JPD reports: (1) whether the reports were admissible as substantive evidence, and (2) whether Rebelwood was entitled to use the reports to cross-examine English's experts. *Id.* at 491-94 (¶¶35-47).[6] As to the first issue, the Supreme Court stated that "[e]ven though police reports, if offered in evidence to prove the truth of the matter asserted are hearsay . . . , they may be admissible under the hearsay exception in Rule 803(8)." *Id.* at 491 (¶36) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 162 n.6, 167-68 (1988)). Rule 803(8) provides that a "record or statement of a public office" is "not excluded by the rule against hearsay" if

(A) it sets out:

(i) the office's activities;

(ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law enforcement personnel; or

(iii) in a civil case or against the prosecution in a criminal case, factual findings from a legally authorized investigation; and

(B) neither the source of information nor other circumstances indicate a lack of trustworthiness.

M.R.E. 803(8). Thus, a "conclusion in a police report may be admitted if 'based on a factual investigation and it satisfies the Rule's trustworthiness requirement.'" *Rebelwood*, 48 So. 3d at 493 (¶42) (brackets omitted) (quoting *Fleming v. Floyd*, 969 So. 2d 881, 885 (¶18) (Miss. Ct. App. 2006), *rev'd on other grounds*, 969 So. 2d 868 (Miss. 2007)).

---

[6] The trial court in the present case correctly recognized that although the *Rebelwood* opinion addresses these two issues together under a single heading, "it really talks about these police reports being used in two different ways," i.e., as substantive evidence and "in cross-examination of the expert."

¶23. In *Rebelwood*, the Supreme Court concluded that the JPD reports at issue were trustworthy because

> Ellis's statements to his mother, uncle, and cousin and his confession at the police station were consistent, were made soon after the crime, and were against his penal interest. The police statement was voluntary and was made after he had been apprised of his rights. The location of the shooting was neither exculpatory or inculpatory. Ellis had no reason to lie about the location, as he would not have known about this civil suit and any effect the location might have. His statement was corroborated by similar statements to his mother, cousin, and uncle. The similar statements to each were corroborated by separate statements taken from each of them. Physical evidence [also] corroborated the statements . . . .

*Id.* at 493 (¶43) (footnote omitted).

¶24. The *Rebelwood* Court also noted that in *Beech Aircraft*, *supra*, the United States Supreme Court identified four factors that may be relevant to a report's "trustworthiness": "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Rebelwood*, 48 So. 3d at 493 (¶44) (quoting *Beech Aircraft*, 488 U.S. at 168 n.11). The *Rebelwood* Court found that those factors collectively supported the admission of the JPD reports. *Id.* The Court ultimately held that the trial court abused its discretion by "failing to perform a trustworthiness analysis before excluding the police report in its entirety." *Id.* at 494 (¶47).

¶25. The Supreme Court also held that the trial court abused its discretion by prohibiting Rebelwood from using the JPD reports to cross-examine English's experts. *Id.* On that issue, the Court emphasized that "English's experts testified that they had relied on portions of the police reports to formulate their opinions, but Rebelwood was prohibited from

12

effective cross-examination designed to impeach their opinions by revealing the contents of the reports they allegedly relied on." *Id.* at 491 (¶38). For example, Lewis was allowed "to testify with impunity and without fear of exposure" that he had read the JPD reports and that there were no witness statements or other evidence indicating that the shooting occurred anywhere other than Rebelwood. *Id.* at 492 (¶39). However, Rebelwood was prohibited from cross-examining Lewis about the contents of the JPD reports, which would have shown his testimony to be false. The Supreme Court concluded that the trial court's ruling "left [the jury] with a false impression" about the JPD reports, "violated the purpose" of the Rules of Evidence (i.e., to determine "the truth"), and denied Rebelwood "a fundamentally fair opportunity to cross-examine" English's witnesses. *Id.*

### B. The UCR's narrative and diagram are not admissible under *Rebelwood* or Rule 803(8).

¶26. Murray argues that the trial court abused its discretion by admitting the UCR, including the narrative and diagram reflecting Trooper Lucas's opinions, into evidence. The trial court admitted the UCR during the testimony of Trooper Lucas after concluding that it satisfied Rule 803(8)'s "trustworthiness" requirement.

¶27. During a hearing outside the presence of the jury, defense counsel initially sought to qualify Trooper Lucas as an expert in the field of "accident investigation," which counsel argued was a recognized field of expertise distinct from accident *reconstruction*. Defense counsel did *not* claim that Lucas was qualified to testify as an expert in accident reconstruction. Rather, defense counsel stated that he was attempting to qualify Lucas as an expert in "accident investigation" because he thought that was necessary to admit the

13

opinion-based portions of the UCR under the "trustworthiness" analysis of Rule 803(8) and

*Rebelwood*, *supra*. However, the trial court concluded that whether the UCR was

"trustworthy" was a "completely different" issue than whether Lucas was qualified to testify

as an expert under Mississippi Rule of Evidence 702. The trial court ultimately ruled:

> [*Rebelwood*] says that, even though police reports, if offered into evidence to prove the truth of the matter asserted, are hearsay, they can be an exception under Rule 803(8).
>
> The four factors that the case says to consider in making a trustworthiness determination [are] the timeliness of the investigation, which occurred within two hours of the incident.
>
> The investigator's skill or experience. He's been a trooper for 24 years, I believe he said, and investigated, I don't know how many accidents.
>
> Whether a hearing was held, which we're doing now.[7]
>
> And possible bias when reports are prepared in view of possible litigation. I don't see where this witness . . . would be biased one way or another.
>
> I don't really like it because I think it's a way of getting in hearsay evidence, but based on this case, which says you're supposed to do that trustworthiness analysis, I find that . . . it is trustworthy.

Based on the above analysis, the trial court ruled that the UCR, including its narrative and

---

[7] A hearing during trial on the admissibility of the report is not the type of hearing contemplated by the *Rebelwood*/*Beech Aircraft* factors. *Beech Aircraft* adopted its four factors from the advisory committee's note to Federal Rule of Evidence 803. *See Beech Aircraft*, 488 U.S. at 168 n.11. The advisory committee note states that one factor to be considered was "whether a hearing was held and the level at which [the hearing] was conducted." F.R.E. 803 advisory committee's note (citing *Franklin v. Skelly Oil Co.*, 141 F.2d 568 (10th Cir. 1944)). *Franklin*, in turn, makes clear that the type of hearing that may be an indicia of trustworthiness is a hearing held by the issuing agency that serves as a basis for the agency's findings in the report. *Franklin*, 141 F.2d at 572. A hearing during trial years later does not make the agency's findings any more or less trustworthy. There were not any hearings before Trooper Lucas completed the UCR in this case.

diagram, was admissible under Rule 803(8).

¶28. This case raises a different issue than *Rebelwood*. The JPD reports in *Rebelwood* compiled evidence gathered by the investigating officers and reached certain factual conclusions. But the JPD reports did not offer expert opinions. The UCR in this case, in contrast, includes not only evidence based on Trooper Lucas's direct observations of the crash scene but also a narrative and diagram that essentially reconstruct the subject crash based on Lucas's *opinions* as to how that crash occurred. This is a material difference between this case and *Rebelwood*.

¶29. In *Mitchell v. Barnes*, 96 So. 3d 771 (Miss. Ct. App. 2012), this Court held that a law enforcement officer who was not present at the time and place of a crash would have to be qualified under Mississippi Rule of Evidence 702 as an expert in accident reconstruction before she could offer opinions as to how the crash occurred or its cause. *Id.* at 779-80 (¶¶29-32). In addition, we held that the trial "court erred in allowing the portion of [the officer's] accident report containing her opinions." *Id.* at 780 (¶33). We explained that "[t]o allow the portion of the accident report containing Rule 702 expert opinions would simply circumvent the" requirements of Rule 702. *Id.* Therefore, we held that "the portion of the accident report containing Rule 702 opinion testimony [was] inadmissible unless [the officer was first] qualified as an expert witness under Rule 702." *Id.*

¶30. In *Rhoda v. Weathers*, 87 So. 3d 1067 (Miss. Ct. App. 2011),[8] this Court applied

---

[8] The Supreme Court granted certiorari in *Rhoda* and reversed this Court on an issue related to alleged discovery violations. *Rhoda v. Weathers*, 87 So. 3d 1036, 1037 (¶1) (Miss. 2012). However, the Supreme Court "affirmed" this Court on "[a]ll other issues," including the issue discussed in the text. *Id.*

*Rebelwood*, *supra*, and Rule 803(8), and held that the trial court did not abuse its discretion by excluding a UCR on the ground that the officer's "investigation was insufficient to reach a trustworthy conclusion as to fault in causing the accident." *Rhoda*, 87 So. 3d at 1070 (¶11). The officer in that case "had some training in accident reconstruction" but "did not do a reconstruction for [the] accident" at issue. *Id.* at (¶14). It appeared that all the officer "did was consider conflicting accounts of who was at fault" and make "a credibility determination" based on the same evidence that the jury was asked to consider at trial. *Id.* at (¶15). We held that the trial court did not abuse its discretion by excluding the officer's conclusions in his Uniform Crash Report as "unreliable." *Id.*

¶31. In *Redhead v. Entergy Mississippi Inc.*, 828 So. 2d 801 (Miss. Ct. App. 2001), this Court applied *Beech Aircraft*, *supra*, and Rule 803(8), and affirmed the exclusion of part of a county forester's report in which the forester opined that power lines were the cause of a fire on a tree farm. *Id.* at 809-10 (¶¶22-24). The trial judge ruled that the forester's opinion was inadmissible "because it was a conclusory opinion offered by a person not qualified to offer such an opinion." *Id.* at 809 (¶24). This Court agreed that the forester's opinion "was a statement given by a person not qualified to make such a statement, and could hardly be considered trustworthy" under *Beech Aircraft* or Rule 803(8). *Id.* at 809-10 (¶24). This Court concluded that the attempt to introduce the report "was basically an attempt by [the plaintiff] to get around the fact [the forester's] lay opinion had already been ruled inadmissible." *Id.* at 810 (¶24).[9]

---

[9] The Supreme Court agreed with *Redhead*'s analysis of this issue in *Jones v. State*, 918 So. 2d 1220, 1231-32 (¶¶29-31) (Miss. 2005).

¶32. In addition, in *Fleming*, *supra*, this Court addressed the admissibility of parts of an accident report that reflected a police officer's opinions as to the cause of the accident. *Fleming*, 969 So. 2d at 886 (¶¶20-21). This Court stated:

> [B]efore an alleged expert on accident reconstruction may be permitted to testify, the qualifications of that witness must be supported by evidence of actual expertise. A law enforcement officer may not have sufficient expertise even when having substantial experience in preparing reports on accidents. A police officer who is not qualified as an expert in accident reconstruction should not be allowed to state opinions on causation or fault in an accident. . . . The fact that [such an] opinion is in a business record[10] does not insulate that opinion from the same rules.
>
> Though police officer Jones's report was a business record, there was no evidence that Jones was qualified to give an opinion on causation. Thus, Jones's opinions were not admissible as a business record.

*Id.* (citations omitted).[11]

¶33. Similarly, although Trooper Lucas had substantial experience investigating accidents and preparing accident reports, there was no evidence that he was qualified as an expert in accident reconstruction. Indeed, as noted above, the defense stated that they would not attempt to qualify him as an expert in that field. Accordingly, Murray properly objected to the admission of the UCR because that document's narrative and diagram reflected Lucas's

---

[10] The *Fleming* Court analyzed the accident report as a "business record" under Rule 803(6), but the Court applied the same "trustworthiness" requirement applicable to public records under Rule 803(8). *See Fleming*, 969 So. 2d at 885 (¶18) (quoting *Beech Aircraft*, 488 U.S. at 170; *Jones*, 918 So. 2d at 1231 (¶29)).

[11] The Supreme Court reversed this Court's decision in *Fleming* on other grounds; however, the Supreme Court expressly "agree[d] with and adopt[ed]" this Court's "analysis and conclusions" with respect to the admissibility of opinion evidence in the accident report. *Fleming v. State*, 969 So. 2d 868, 875-76 (¶21) (Miss. 2007). In addition, in *Rebelwood*, the Supreme Court cited this Court's analysis in *Fleming* with approval. *See Rebelwood*, 48 So. 3d at 493 (¶42).

otherwise inadmissible opinions regarding the vehicles' paths, causation, and fault. Lucas was not qualified to offer such opinions. The admission of Lucas's opinions through the UCR improperly "circumvent[ed]" the requirements for expert opinions under Rule 702. *Mitchell*, 96 So. 3d at 780 (¶33).

¶34. Under Rule 702, a witness may testify in the form of an expert opinion only if the "witness . . . is qualified as an expert by knowledge, skill, experience, training, or education," his testimony will assist the trier of fact, and his testimony is "reliable." M.R.E. 702; *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35, 38 (¶¶7, 16) (Miss. 2003). Similarly, under Rule 803(8), findings or conclusions in a public record are not admissible to the extent that the "circumstances indicate a lack of trustworthiness." M.R.E. 803(8)(B). While perhaps not identical, these two issues are closely related. *See Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 590 n.9 (1993) (stating that Federal Rule of Evidence 702 requires "*evidentiary* reliability—that is, trustworthiness"). We conclude that an opinion that would not be admissible under Rule 702 if offered in court by a live witness cannot be deemed "trustworthy" and admitted under Rule 803 just because it is contained in a public record. Because Trooper Lucas was not qualified as an expert in accident reconstruction, his opinions on the paths of the subject vehicles and fault did not satisfy Rule 803(8)'s trustworthiness requirement. Accordingly, the trial court abused its discretion by admitting the UCR's narrative and diagram. *Mitchell*, 96 So. 3d at 780 (¶33); *Fleming*, 969 So. 2d at 886 (¶¶20-21); *Redhead*, 828 So. 2d at 809-10 (¶24).

### C. The defendants were not entitled to cross-examine Hannah regarding the UCR's narrative.

¶35. With respect to the cross-examination of Hannah, this case is also materially different from *Rebelwood*. On cross-examination, defense counsel asked Hannah whether he "relied upon [the UCR], at least in part, in formulating [his] opinions." Hannah answered, "The answer to that, yes, but the further of that would be it gave me a location, a date, a time, and there were photographs taken that I used then and now." Hannah's testimony did not mislead the jury or give a false impression about the UCR. Nor did Hannah did make any factual claims that the UCR would have shown to be false. Nor did Hannah state or imply that Trooper Lucas agreed with his opinions about how the wreck occurred or which driver was at fault. Indeed, it seems safe to say that *any* accident reconstructionist would testify as Hannah did—i.e., that he had reviewed and relied on the UCR for the basic facts regarding the time and location of a crash, along with any photographs taken. That alone should not open the door to cross-examination of the expert about otherwise inadmissible opinions contained in the UCR.

¶36. As discussed above, the problem in *Rebelwood* was that the plaintiff's experts gave testimony that affirmatively misrepresented the JPD reports and the evidence that JPD had gathered. *Rebelwood*, 48 So. 3d at 492 (¶39). As a result, the trial court's ruling prohibiting cross-examination about the JPD reports "left [the jury] with a false impression" about the reports and underlying evidence and "denied [Rebelwood] a fundamentally fair opportunity to cross-examine" the plaintiff's experts. *Id.* Here, in contrast, Hannah's testimony did not give the jury a false impression regarding the UCR, and the defendants could have conducted a full and fair cross-examination of Hannah without injecting Trooper Lucas's opinions into

19

the case. There is no general right to cross-examine an opposing party's expert about the inadmissible opinions of a non-expert. Moreover, Hannah's acknowledgment that he reviewed or relied on the UCR did not open the door to cross-examination about otherwise inadmissible parts of the UCR. Accordingly, we also conclude that the trial court abused its discretion by allowing cross-examination of Hannah concerning Trooper Lucas's opinions, as reflected in the narrative and diagram sections of the UCR.

### III. Murray waived any objection to Trooper Lucas's opinion testimony.

¶37. Prior to trial, Murray filed a motion in limine to prohibit any mention of the conclusions and opinions that Trooper Lucas expressed in the UCR. In a pretrial hearing, defense counsel stated, "Candidly, Judge, there is a narrative component of the [UCR] where Trooper Lucas essentially states his opinion as to what happened and does a little diagram. I believe the law is clear until you qualify him as an expert in accident investigation, that narrative portion can't come in." The court stated that it would "wait to rule on that" issue until it came up during trial. The court also added, "[Lucas] may not be an expert, but he can give lay opinions."

¶38. During trial, as discussed above, the court first allowed defense counsel—over Murray's objection—to cross-examine Hannah about the substance of Lucas's conclusions and opinions. Next, the defendants called Lucas as a witness in their case-in-chief, and Lucas testified, *without objection*, that he concluded that Murray's vehicle had crossed the center line of the highway and entered into Parker's (southbound) lane prior to the collision. Lucas testified that he based his opinion on the physical evidence at the crash scene and what

20

the two drivers told him. *After* Lucas had already testified to that opinion, the defense asked that he be "qualified as an expert in the field of accident investigation." Murray objected, and a hearing outside the jury's presence ensued. The court asked defense counsel why Lucas needed to be qualified as an expert witness when he had already offered his opinion without objection. Counsel responded that he wanted the UCR to be admitted into evidence, and he believed that qualifying Lucas as an expert was necessary to satisfy "trustworthiness requirement" of *Rebelwood*, *supra*, and Rule 803(8).

¶39.    The trial court then asked Murray's attorney to respond. The court observed that counsel "didn't object when . . . [Lucas] said it was his opinion that the northbound vehicle crossed over in the southbound lane." Murray's attorney responded, "Your Honor, first of all, this has actually already been ruled on and it was denied. But this witness can—he can testify to lay opinions. That's permissible under the rules. But he cannot qualify as an expert accident reconstructionist, number one, because he said it himself, he's not." Later, Murray's attorney stated, "Your Honor, . . . you said that he could testify about [his 'lay opinion']. You have been consistent with that part of it." Murray also argued that "accident investigation" was not a recognized field of expertise under Rule 702.

¶40.    On appeal, Murray argues that "[t]he trial court erred in allowing Trooper Lucas to opine as to the cause of the accident" because Lucas "was neither an expert nor an accident reconstructionist." However, Lucas testified to that opinion *without objection*. As stated above, the trial court expressly reserved ruling on this issue prior to trial, stating that he would "wait to rule" on it until it came up during the trial. The judge did add that Lucas

21

could "give lay opinions" even if he was not an "expert witness," but there was no discussion or any specific ruling as to what sort of "lay opinions" would be permitted.[12]

¶41.    In the absence of a definitive ruling in advance of trial, Murray was required to make a contemporaneous objection during Lucas's testimony.  M.R.E. 103 advisory committee note ("[W]hen the trial court has reserved its ruling [on a motion in limine] or has indicated that the ruling is provisional," the objecting party must "bring the issue to the court's attention subsequently.").  We conclude that Murray waived any objection to Lucas's testimony by failing to make such an objection. *Canadian Nat'l/Ill. Cent. R.R. Co. v. Hall*, 953 So. 2d 1084, 1096-97 (¶42) (Miss. 2007).

> **IV.    The trial court abused its discretion by permitting the defendants to cross-examine Hannah about a judicial opinion in another case and the evidence in two other cases.**

¶42.    Murray finally argues that the trial court erred by allowing defense counsel to cross-examine Hannah about a judicial opinion and evidence in prior cases in which Hannah testified or his testimony had been excluded.  Over objection, defense counsel was allowed to ask Hannah if he knew whether the court in *Burnham* (*see supra* note 1) "struck [Hannah's] opinions as not being sufficiently tied to the facts or evidence in the record so as to be admissible."  Over objection, defense counsel also was allowed to cross-examine Hannah about eyewitness testimony and other evidence in two other cases that allegedly contradicted Hannah's opinions in those cases.

---

[12] Murray may have thought it pointless to object to Lucas's opinion testimony given that the court had already allowed the defense to cross-examine Hannah about Lucas's opinions.  However, Murray did not make that argument at trial or on appeal.

¶43. An expert witness is subject to "wide-open cross-examination" on "any matter that is relevant." *Redding v. Miss. Transp. Comm'n*, 169 So. 3d 958, 964 (¶21) (Miss. Ct. App. 2014) (quoting *Anthony v. State*, 108 So. 3d 394, 397 (¶6) (Miss. 2013)); *see also* M.R.E. 611(b) ("The court may not limit cross-examination to the subject matter of the direct examination and matters affecting the witness's credibility."); M.R.E. 616 ("Evidence of a witness's bias, prejudice, or interest—for or against any party—is admissible to attack the witness's credibility."). For example, an expert may be cross-examined about how often he testifies and what percentage of his testimony is for plaintiffs or defendants. *See Wright v. Turan-Foley Motors Inc.*, 269 So. 3d 160, 168-69 (¶33) (Miss. Ct. App. 2018). In addition, it is entirely proper to impeach an expert witness by showing that he has offered inconsistent opinions in prior litigation. *See* 1 *McCormick on Evidence* § 35 (8th ed. 2020) ("If a witness, such as an expert, testifies in terms of opinion, all courts permit impeachment by showing the witness's previous expression of an inconsistent opinion.").

¶44. The issue in this case is significantly different. The question here is whether a witness whose testimony has survived a *Daubert*/*McLemore*[13] challenge and who the trial court has deemed qualified to testify as an expert may be cross-examined at trial about a ruling in another case in which another court excluded his testimony under *Daubert* or *McLemore*. The parties have not cited and we have not found any Mississippi precedent that is on point. However, we find persuasive the reasoning of a federal district court that addressed the same

---

[13] *Daubert*, 509 U.S. at 588-95 (holding that expert testimony is admissible under Federal Rule of Evidence 702 if it assists the trier of fact and is reliable); *McLemore*, 863 So. 2d at 38 (¶16) (holding that Mississippi Rule of Evidence 702 requires the same).

issue. *Estate of Thompson v. Kawasaki Heavy Indus. Ltd.*, 933 F. Supp. 2d 1111, 1152 (N.D. Iowa 2013). The court in that case had already denied a pretrial motion to exclude the expert's testimony. *Id.* The court reasoned that any "attempt to present a *Daubert* ruling of another court . . . would be an attempt to circumvent [this court's] role as the 'gatekeeper' *in this case* by asking the jurors to substitute . . . the judgment *of another court, in another case*, about whether or not an expert is qualified." *Id.* The court also reasoned that "allowing such evidence would, inevitably, result in delay, while the parties conduct a 'mini-trial' over the issues" in the prior case, the expert's testimony in the prior case, the reasons that the other court excluded his testimony, and the differences between the two cases. *Id.*

¶45. We agree with this reasoning. Trial courts routinely instruct juries not to infer anything from the court's rulings on motions or objections. *See, e.g.*, *Trigg v. State*, 803 So. 2d 1229, 1236 (¶20) (Miss. Ct. App. 2002). Certainly, then, juries should not be asked to infer anything from evidentiary rulings by other courts in other cases. The federal district court in *Burnham*, *supra*, was critical of Hannah's opinions *in that case* and ruled that they were not admissible because they were not sufficiently tied to the facts *of that case*. To be sure, Hannah's testimony in *Burnham* involved similar issues related to a "gouge mark," and the defendants properly relied on the *Burnham* opinion as persuasive authority in support of their motion to exclude Hannah's testimony in this case. However, once the trial court ruled that Hannah could testify in this case, the opinion in *Burnham* was not a proper subject of cross-examination before the jury because its only purpose was to ask the jury to substitute the judgment of another court for the ruling of the trial court in this case. We conclude that

24

the trial court abused its discretion by allowing cross-examination about the *Burnham* opinion because it had no relevance to the present case and yet created a risk of unfair prejudice, misleading the jury, and confusing the issues. M.R.E. 401-403.[14]

¶46.    We reach the same conclusion regarding questions about alleged contradictions between Hannah's opinions in two other cases and eyewitness testimony or other evidence in those cases. The purpose of those questions was *not* to show that Hannah's opinions in the present case were somehow inconsistent with his testimony in prior cases. That would have been a proper method of impeachment, *see* 1 *McCormick on Evidence*, *supra*, § 35, but the defendants do not make any such claim. Rather, the apparent purpose of the questions was to suggest that Hannah had given opinions in other cases that were faulty. Murray's objection to these questions should have been sustained because the questions had no relevance to Hannah's opinions in this case. The defendants have a right to cross-examine Hannah vigorously to expose faulty or unsupported assumptions and flawed reasoning or methods, but their vigorous cross-examination of him must still relate to his "opinions *in this case*, based on his reasoning, methodology, and the facts and assumptions on which he relied

---

[14] The partial dissent argues that the cross-examination in this case was comparable to the questions permitted in *Nagle v. Gusman*, No. 12-1910, 2016 WL 9411379, at *1 (E.D. La. Mar. 3, 2016). *See post* at ¶¶57-58 & n.18. We respectfully disagree. In *Nagle*, the cross-examination concerned another court's factual findings that were "probative of [the expert's] potential bias" because the findings "arguably demonstrate[d]" that the expert was "willing[] to disregard . . . evidence in order to achieve a desired result." *Nagle*, 2016 WL 9411379, at *1. That ruling seems correct to us. Cross-examination to show bias is entirely proper. *See* M.R.E. 616. Here, in contrast, defense counsel cross-examined Hannah about another court's *Daubert* ruling, i.e., "whether the [*Burnham*] [c]ourt struck [Hannah's] opinions as not being sufficiently tied to the facts or evidence in the record so as to be admissible." For the reasons explained in *Estate of Thompson*, *supra*, such a ruling is not a proper subject of cross-examination.

*in this case.*" *Estate of Thompson*, 933 F. Supp. 2d at 1152.

**V.     Murray is entitled to a new trial based on the cumulative effect of errors during the first trial.**

¶47.    We will not reverse a judgment entered on a jury verdict because evidence was admitted or excluded in error unless the error actually prejudiced a party or adversely affected a party's substantial rights. *Ill. Cent. R.R. Co. v. Brent*, 133 So. 3d 760, 779 (¶42) (Miss. 2013). Under the harmless error doctrine, "if the weight of the evidence . . . is sufficient to outweigh any harm done by [the error] then reversal is not warranted." *Id.* (quotation marks and brackets omitted); *accord* M.R.C.P. 61. However, there is a corollary to the harmless error doctrine. Under the cumulative error doctrine, multiple errors that individually are not reversible "may constitute reversible error if the cumulative effect of the errors resulted in an unfair trial." *Lacoste v. Lacoste*, 197 So. 3d 897, 913 (¶58) (Miss. Ct. App. 2016) (citing *Blake v. Clein*, 903 So. 2d 710, 732 (¶68) (Miss. 2005)).

¶48.    In this appeal, we have identified four errors in the trial: (1) the admission of Trooper Lucas's hearsay testimony about what Parker said at the crash scene, (2) the admission of the UCR, (3) the cross-examination of Hannah about Lucas's opinions, as reflected in the UCR's narrative, and (4) the cross-examination of Hannah about the court's opinion in the *Burnham* case and evidence in two other unrelated cases.

¶49.    The defendants argue that "at the very worst, the issues complained of in this appeal amount to nothing more than harmless error" because Murray's "own expert witness ultimately testified . . . that the collision occurred within . . . Parker's southbound lane of

traffic, and that [Murray], not [Parker], crossed the centerline and caused the accident."[15] In essence, the defendants argue that any error was harmless because the trial court could have directed a verdict based on Hannah's testimony regarding the location of the accident.

¶50. We disagree. Murray denied that she crossed the centerline, and she testified that her vehicle was in her lane when the crash occurred. A jury could have credited her testimony on this issue rather than Hannah's opinion. The jury was not required to accept Hannah's testimony regarding the location of the collision. The weight and credibility of witnesses' testimony, including expert testimony, is for a jury to determine, and a jury is free to accept parts of an expert's testimony even while rejecting other parts. *Knight v. Clark*, 283 So. 3d 1111, 1119 (Miss. Ct. App. 2019), *cert. denied*, 283 So. 3d 735 (Miss. 2019). Indeed, there was ample reason for the jury to reject Hannah's testimony regarding the location of the collision because Hannah based his opinion entirely on the location of an alleged "gouge mark" that only Hannah saw and failed to photograph. The jury could have concluded that Hannah's testimony on this point was baseless because there was no evidence that the alleged gouge mark had anything to do with the subject crash.[16]

¶51. With respect to Trooper Lucas's hearsay testimony about Parker's post-crash statement, our Supreme Court has concluded that such an error is not "harmless" just because

---

[15] This is not an entirely accurate summary of Hannah's testimony. Hannah opined that *both* vehicles crossed the center line, and he concluded that Parker was at fault in causing the accident.

[16] The defendants did not cross-appeal the pretrial ruling denying their motion to exclude or limit Hannah's testimony. Therefore, we do not address whether Hannah should be allowed to testify about the alleged gouge mark at a new trial.

it is "cumulative" of the driver's own in-court testimony. *Swaggart*, 363 So. 2d at 255. In

*Swaggart*, a deputy sheriff testified that a few days after a two-vehicle wreck, one of the

drivers involved (Haney) gave a statement that the other vehicle was on the wrong side of

the road and caused the crash. *Id.* at 255. On appeal, the Supreme Court held that the trial

court committed reversible error by overruling an objection to the testimony. *Id.* The

Supreme Court reasoned that the error was not harmless because the deputy's testimony

addressed "a highly disputed and hotly contested question of fact as to how the accident

occurred," and because the trial court improperly "allow[ed] . . . Haney's out-of-court

testimony to supplement his in-court testimony making his testimony double-barrelled in the

sense that it came from two witnesses, one of them a law officer." *Id.* The Supreme Court

acknowledged that the deputy's hearsay testimony was "cumulative" in a sense, but the Court

concluded that "coming from a witness (deputy sheriff) wearing the badge of the law, it

could very likely have been given more weight and worth than it would have had it come

from only [Haney] himself." *Id.* The Court further stated:

> [T]he issue of which driver was negligent was a very close factual question,
> making the [deputy's] testimony of greater significance than would be the case
> if the proof were overwhelming that Haney did not invade [the other driver's]
> traffic lane. The absence of any eye-witness to the collision (except [the two
> drivers]) added to the likelihood that the [deputy's] testimony improperly
> influenced the jury.

*Id.* at 255-56.

¶52.     The defendants attempt to distinguish *Swaggart* on the ground that the evidence in this

case supposedly *was* "overwhelming" that Murray invaded Parker's lane. The defendants

again rely on the fact that Murray's own expert testified that the collision occurred slightly

28

within the southbound lane. However, as discussed above, the jury was free to reject Hannah's testimony regarding the location of the collision, which was based entirely on the undocumented gouge mark. Apart from Hannah's gouge-mark testimony, the fact dispute in this case essentially mirrored the fact dispute in *Swaggart*: there were no eyewitnesses other than the two drivers, whose testimonies were in conflict. In addition, there is the same risk that Trooper Lucas's hearsay testimony carried greater weight than either of the drivers' testimonies and "improperly influenced the jury." *Id.* Moreover, it would be difficult, if not impossible, for us as an appellate court to say that the evidence was "overwhelming"—or to declare with confidence that the error was "harmless"—when we know that three of the twelve jurors, who listened to and observed the witnesses firsthand, found in favor of Murray despite the admission of hearsay that improperly bolstered Parker's testimony.

¶53. Finally, when assessing possible prejudice to Murray, we must take into account not only the improperly admitted hearsay but also the error in admitting the UCR and the improper cross-examination of Hannah. *See Lacoste*, 197 So. 3d at 913 (¶58); *Blake*, 903 So. 2d at 732 (¶68). Given the divided jury verdict, we cannot say that the evidence was so overwhelming that the cumulative effect of these errors can be dismissed as harmless. Accordingly, we conclude that the judgment must be reversed and the case remanded for further proceedings consistent with this opinion and a new trial.

## CONCLUSION

¶54. Based on the cumulative effect of errors in the first trial, Murray is entitled to a new trial. We do not address the admissibility of Trooper Lucas's opinion testimony because

29

Murray waived that issue by failing to obtain a definitive ruling on her pretrial motion in limine and by not objecting during trial. If that issue arises again in the context of a new trial, the court should consider the relevant caselaw discussed in Part II.B, *supra*. We also do not address the admissibility of Hannah's testimony regarding the alleged gouge mark because the defendants did not file a cross-appeal on that ruling. The trial court may revisit that issue if it arises again on remand.

¶55. **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J. McCARTY, J., NOT PARTICIPATING.**

**CARLTON, P.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶56. I agree with the majority's decision with respect to the first three issues discussed above, namely that the trial court abused its discretion (1) by allowing Trooper Lucas's hearsay testimony about Parker's statement at the crash scene; (2) by allowing defense counsel to read from the UCR's narrative section during his cross-examination of Hannah and by then admitting the entire UCR into evidence; and (3) by allowing Trooper Lucas to opine as to the cause of the crash. I also find that reversal and remand is necessary due to the cumulative effect of these errors. Therefore, I concur in part and in the result with respect to these issues.

¶57. However, I do not agree with the majority's determination that the trial court abused its discretion by permitting the defendants to cross-examine Hannah (the plaintiff's expert)

about a judicial opinion in another case, namely the *Burnham* decision.[17]  The majority believes that this was improper because "once the trial court ruled that Hannah would be allowed to testify in this case, the opinion in *Burnham* was not a proper subject of cross-examination before the jury because its only purpose was to ask the jury to substitute the judgment of another court for the ruling of the trial court in this case."  Maj. Op. at ¶45.  Because there is no Mississippi caselaw on this particular point, the majority relies on *Estate of Thompson*, 933 F. Supp. 2d at 1152, in support of its analysis.  I find the analysis in *Nagle v. Gusman*, No. 12-1910, 2016 WL 9411379 (E.D. La. Mar. 3, 2016), more persuasive.

¶58.    In *Nagle*, the federal district court allowed defendants to cross examine the plaintiffs' expert (Dr. Schwartz) about another court's "findings [in *Hudson v. Preckwinkle*, No. 13 C 8752, 2015 WL 1541787 (N.D. Ill. March 31, 2015),] regarding Dr. Schwartz's objectivity as an expert."  *Nagle*, 2016 WL 9411379, at \*1.  As the *Nagle* court explained, the *Hudson* case was "another inmate lawsuit regarding prison conditions," and the court in *Hudson* "accorded 'little weight' to Dr. Schwartz's expert opinion due to his 'heavy reliance' on unsworn, self-serving statements by prison inmates and summary statements written by the lawyers who hired him."  *Id.* (citing *Hudson*, 2015 WL 1541787, at \*11).[18]  Given the

[17] For the reasons stated in the majority opinion, I agree that it was an abuse of discretion for the trial court to allow defense counsel to cross-examine Hannah about alleged contradictions between Hannah's opinions in two other cases and eyewitness testimony or other evidence in those cases.  The record reflects that these cases do not appear to concern Hannah's testimony regarding gouge marks or any other relevant similarities to Hannah's opinions in this case.

[18] I recognize that *Hudson* is not a case in which the court excluded the expert's opinions under *Daubert*.  Rather, in *Hudson* the district court denied the defendants' *Daubert* motion to exclude Dr. Schwartz's opinions, but at the preliminary injunction

31

similarities between *Hudson* and the case before it, the *Nagle* court found "that this evidence regarding Dr. Schwartz's experience in a prior lawsuit is relevant to his potential bias and credibility as an expert witness in this case." *Id.* Continuing, the court explained:

> Dr. Schwartz's conduct as an expert in the *Hudson* litigation (which involved allegations similar to plaintiffs' claims here) arguably demonstrates Dr. Schwartz's willingness to disregard the quality of evidence in order to achieve a desired result . . . . In addition, the supposed prejudicial effect of this line of questioning is not substantially unfair. *See Scordill v. Louisville Ladder Grp. LLC*, No. 02-2565, 2004 WL 307475, at *12 [(E.D. La. Feb. 17, 2004)] ("Use of previous exclusion of an expert's testimony is permissible to impeach the credibility and credentials of the expert.").

*Id.*

¶59. As the majority recognizes in this case, *Burnham* concerned "similar testimony by Hannah that a gouge mark established the point of collision in a crash." *See* Maj. Op. at ¶7 & n.1. Further, I do not find that the defendants' use of *Burnham* in this case was unfairly prejudicial. The jury was not specifically told that Hannah's testimony had been excluded by the federal district court in *Burnham*.[19] Given these factors, and the broad scope of

---

hearing the court gave his opinions "little weight" for the reasons identified. *See Hudson*, 2015 WL 1541787, at *9-11. In contrast, the federal district court in *Burnham* excluded Hannah's testimony that a gouge mark established the point of collision in a crash. However, I do not find that this is a distinguishing factor in this case. The relevant point to me is that *Burnham* arguably shows "[Hannah's] willingness to disregard the quality of evidence in order to achieve a desired result," *Nagle*, 2016 WL 9411379, at *1, which I find is a proper use of this opinion. I find that this is particularly true here because the jury was not told that Hannah's testimony was excluded by the *Burnham* court, as I address above.

[19] The questioning on this issue proceeded as follows:

> Q.    Mr. Hannah, in this *Burnham* case . . . . Do you have any knowledge whether the Court struck your opinions as not being sufficiently tied to the facts or evidence in the record so as to be admissible?

cross-examination of expert witnesses recognized under Mississippi law (as delineated in the majority's opinion in paragraph 43, above), I do not find that it amounted to an abuse of discretion on the trial court's part to allow plaintiff's expert to be cross-examined on the *Burnham* decision. For this reason, I dissent with respect to this particular issue.

**GREENLEE, J., JOINS THIS OPINION.**

---

A.   I do not. What I do know is, I gave a deposition and I knew nothing else about the case, as I do in a lot of my cases.